**Case No. 21-1020**

In the United States Court of Appeals
for the Tenth Circuit

**The High Lonesome Ranch, LLC,**
*Plaintiff / Counterclaim Defendant-Appellant,*

v.

**Board of County Commissioners for Garfield County,**
*Defendant / Counterclaimant / Cross-Claimant-Appellee,*

and

**The United States of America, through its agency,
the Bureau of Land Management, a division of
the United States Department of the Interior,**
*Defendant / Crossclaim Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Colorado
Case No. 17-cv-1260-RBJ-GPG
The Honorable R. Brooke Jackson

**BRIEF OF AMICI CURIAE PRIVATE-LAND
CONSERVATION AND AGRICULTURAL GROUPS
IN SUPPORT OF APPELLANT AND REVERSAL**

Christopher O. Murray
Julian R. Ellis, Jr.
Sean S. Cuff
Brownstein Hyatt
  Farber Schreck, LLP
410 17th Street, Suite 2200
Denver, CO 80202
(303) 223-1100
cmurray@bhfs.com; jellis@bhfs.com;
scuff@bhfs.com

## CORPORATE DISCLOSURE STATEMENTS

Amici Curiae Western Landowners Alliance (WLA), Rocky Mountain Farmers Union (RMFU), Utah Farmers Union (UFU), The Property and Environment Research Center (PERC), and New Mexico Habitat Conservation Initiative (NMHCI) submit these disclosure statements under Federal Rule of Appellate Procedure 26.1(a).

**WLA** is a non-profit 501(c)(3) organization and has no corporate parent and is not owned in whole or in part by any publicly held corporation.

**RMFU** is a non-profit 501(c)(5) organization and has no corporate parent and is not owned in whole or in part by any publicly held corporation.

**UFU** is a non-profit 501(c)(3) organization and has no corporate parent and is not owned in whole or in part by any publicly held corporation.

**PERC** is a non-profit 501(c)(3) organization and has no corporate parent and is not owned in whole or in part by any publicly held corporation.

**NMHCI** is a non-profit 501(c)(4) organization and has no corporate parent and is not owned in whole or in part by any publicly held corporation.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENTS ...................................ii

TABLE OF AUTHORITIES..................................................iv

INTEREST OF AMICI CURIAE ...........................................1

SUMMARY OF THE ARGUMENT ......................................2

ARGUMENT ...................................................................5

   I.  The Conservation of Private Land in the West
      Is of Paramount Importance ...........................................5

      A.  The settlement of the American West .....................5

      B.  The conservation of working land requires
         private participation and action ..............................9

   II.  Expanded Access Under R.S. 2477 Threatens the
      Success of Conservation Projects on Private Land.......................14

   III. The District Court's Decision Will Exacerbate the
       Conservation-Related Problems Landowners Face and
       Will Curb Investment ...................................................22

CONCLUSION.................................................................29

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)..................31

CERTIFICATE OF SERVICE...............................................32

# TABLE OF AUTHORITIES

**Page(s)**

*Cases*

*High Lonesome Ranch, LLC v. Bd. of Cnty. Comm'rs*,
No. 17-cv-1260-RBJ-GPG, slip op.
(D. Colo. Dec. 22, 2020)..................................................................22, 23

*S. Utah Wilderness All. v. BLM*,
425 F.3d 735 (10th Cir. 2005)..................................................16, 22, 23

*Sierra Club v. Hodel*,
848 F.2d 1068 (10th Cir. 1988)..........................................................16

*The Wilderness Soc'y v. Kane Cnty.*,
632 F.3d 1162 (10th Cir. 2011)..........................................................16

*Statutes*

43 U.S.C. § 932 (1866)............................3, 4, 14, 15, 16, 18, 19, 20, 22, 23

Federal Land Policy and Management Act of 1976,
Pub. L. No. 94-579, 90 Stat. 2743 (1976)............................................23

Homestead Act of 1862,
Pub. L. No. 37-64, 12 Stat. 392 (1862) ..................................................6

*Other Authorities*

2015 Annual Parks & Wildlife Law Enforcement & Violation
Report, Colo. Dep't Wildlife, 2015 ......................................................21

*Biden 30x30 Plan Emphasizes Landowners' Key Role in
Conservation's Future*, W. Landowners All., May 6, 2021................12

Bret C. Birdsong, *Road Rage and R.S. 2477: Judicial and
Administrative Responsibility for Resolving Road Claims
on Public Land*, 56 Hastings L.J. 523 (2005)...............................15, 16

Brian Yablonski, *Private Land Stewardship Is the Next
Frontier of Conservation and a Critical Component to
Achieving 30 by 30*, PERC, May 6, 2021 ...........................................12

# TABLE OF AUTHORITIES (con't)

Christine Whitt et al., *Agritourism Allows Farms To
   Diversify and Has Potential Benefits for Rural
   Communities*, U.S. Dep't Agric., Econ. Rsch. Serv.,
   Nov. 4, 2019 .................................................................. 26, 27

Cole Mannix & Lesli Allison, *Conservation Economics on
   Western Working Lands*, W. Landowners All., Dec. 2019............. 8, 27

*The Disappearing West*, Ctr. Am. Progress ........................................... 14

Exec. Order No. 14,008, 86 Fed. Reg. 7,619 (Feb. 1, 2021) ................... 12

*Fact Sheet: Habitat Loss & Fragmentation*, Wildlife Soc'y ................... 17

Greg Bradsher, *How the West Was Settled*, Prologue Mag.,
   Winter 2012, at 27 .......................................................... 5, 6

James MacGregor, *Developing a National Sustainable
   Tourism Strategy: Going Beyond Ecotourism to Protect the
   Planet's Resources*, *in* 99 Bull. Series, Yale Sch. of
   Forestry & Env't, The Ecotourism Equation: Measuring
   the Impacts 11 (Elizabeth Malek-Zadeh ed., 1996) ........................... 26

Jana & Ron Smith, *Beware the Consequences of RS 2477
   Right-of-Way Claims*, Salt Lake Trib., June 21, 2003 ...................... 20

*The Land Ethic*, Aldo Leopold Found. ..................................................... 13

Lee Ann Potter & Wynell Schamel, *The Homestead Act of
   1862*, Soc. Educ., Oct. 1997, at 359 ....................................... 5

Lesli Allison et al., *Speaking from Experience: Landowners &
   the Endangered Species Act*, W. Landowners All., 2017...................... 7

Letter from Dr. S. Hoffman to Hons. Lew Entz & Jack
   Taylor, Colo. Sen. Comm. on Agric., Feb. 25, 2004 .......................... 20

Mark Boslough, *RS 2477 Reform Is Needed to Protect Private
   Property*, Entering Stage Right, Feb. 23, 2004 ................................. 19

## TABLE OF AUTHORITIES (con't)

Marsha Sitnik, *Sustainable Ecotourism: The Galapagos Balance*, *in* 99 Bull. Series, Yale Sch. of Forestry & Env't, The Ecotourism Equation: Measuring the Impacts 89 (Elizabeth Malek-Zadeh ed., 1996)......................................................26

Maxwell C. Wilson et al., *Habitat Fragmentation and Biodiversity Conservation: Key Finds and Future Challenges*, Landscape Ecology, Feb. 2016, at 219............................16

Michael S. Freeman & Lusanna J. Ro, *RS 2477: The Battle over Rights-of-Way on Federal Land*, Colo. Law., Oct. 2003, at 105 ................................................................15

Paul Herndon, *They Called It Homesteading*, Our Pub. Lands, Summer 1977, at 12....................................................6

Paul W. Gates, *The Homestead Law in an Incongruous Land System*, 41 Am. Hist. Rev. 652 (1936) ...................................7

*Paying for Stewardship: A Western Landowners' Guide to Conservation Finance*, W. Landowners All., Mar. 2020 ........ 25, 26, 27

R. Travis Belote et al., *Wild, Connected, and Diverse: Building a More Resilient System of Protected Area*, Ecological Applications, June 2017, at 1050........................................8

Robert Rattner, *Ecotourism's Identity Crisis: How Green is My Vacation?*, *in* 99 Bull. Series, Yale Sch. of Forestry & Env't, The Ecotourism Equation: Measuring the Impacts 83 (Elizabeth Malek-Zadeh ed., 1996)................................27

*RS 2477 Fact Sheet: Impacts on Private Property*, S. Utah Wilderness All..................................................................19

Tara Lund, *Recovery of Rare Plant Population and Species Richness on a Calcareous Floodplain in Southwestern Montana*, Native Plants J., Spring 2021, at 81...................................28

U.S. Dep't of the Interior et al., *Conserving and Restoring America the Beautiful*, 2021 ...............................................12

# TABLE OF AUTHORITIES (con't)

U.S. Dep't of the Interior, Report to Congress on
R.S. 2477: The History and Management of R.S. 2477
Rights-of-Way Claims on Federal and Other Lands
(June 1993)...........................................................................15

Whitney Tilt, *Elk in Paradise: Conserving Migratory Wildlife
and Working Lands in Montana's Paradise Valley*, PERC,
July 2020...........................................................................11

*Why Protecting 30% of Lands and Waters is Critical*,
Wilderness Soc'y, Mar. 5, 2021...........................................14

*Wildlife Corridors Conservation Act of 2019: Hearing on H.R.
2795 Before H. Nat. Res. Subcomm. on Water, Oceans, and
Wildlife of the H. Comm. on Nat. Res.*, 116th Cong. (2019)...............10

## INTEREST OF AMICI CURIAE[1]

Amici curiae are private-land conservation and agricultural groups in the western United States. Western Landowners Alliance, Rocky Mountain Farmers Union, Utah Farmers Union, and New Mexico Habitat Conservation Initiative are comprised of landowners and land managers, including farmers and ranchers, who represent millions of acres of deeded and leased land across every western state. The Property and Environment Research Center is a conservation and research institute dedicated to improving environmental quality through property rights and markets.

Private and working lands encompass productive and biologically diverse landscapes that are essential to the West's food and water security. They provide valuable open space, protect crucial habitat and wildlife corridors, harbor most imperiled species, and control much of the headwaters critical to watersheds and downstream users. Likewise, the ranches and farms operating on these lands are both cultural mainstays and important economic drivers for rural communities, providing jobs and a high-quality way of life.

Amici work to promote the responsible use and sound stewardship of natural resources, sustain intact and economically viable working

---

[1] All parties have consented to this filing. No party's counsel authored this brief in whole or in part, and no person or entity other than amici, their counsel, or their members made a monetary contribution intended to fund the brief's preparation or submission.

lands, conserve wildlife habitat, support rural communities, protect private-property rights, and provide a safe and secure food supply. The success of amici's missions is partially predicated on the contiguity of private working lands in the West, whose fragmentation is encouraged by the district court's decision. Contrary to the subtext of the district court's findings, landowners of historically significant properties like the High Lonesome Ranch are not engaged in miserly shutting out the public; instead, these landowners are stewards of the land and their practices—including managing public access and land use—are necessary to keep the land healthy, productive, and intact.

## SUMMARY OF THE ARGUMENT

The district court's decision declaring two service roads on the High Lonesome Ranch "public highways" jeopardizes pivotal conservation efforts on the most productive and ecologically diverse lands in North America—western private land.

**I.A.** Through settlement of the American West, the most fertile and productive lands became today's private land. Motivated by land ownership available under the Homestead Act, homesteaders flocked to habitable, well-watered, and fertile pockets of land to build their lives. Much of this land remains in private ownership today. As a result, private land contains some of the richest biodiversity across the western landscape and headwaters critical to western watersheds. Because of

the quality of these lands, meaningful conservation in the West *must* account for the incentives and challenges private landowners face.

**B.** Private land does not conserve itself. Indeed, conservation on private land depends on private landowners and their land-management practices. Ranchers and farmers in the West—including amici's members—actively participate in conservation projects that play a crucial role in restoring local populations of threatened wildlife and habitat. These projects are broad in scope, from the largest collaborative conservation effort in history to conserve 4.4 million acres of habitat across the West for the Greater Sage Grouse, to expanding and managing riparian areas in Nevada to support a species of toad found nowhere else on Earth, to restoring an extinct stream channel in Montana, which increased species diversity by 600%.

**II.** Expanding access across private land under R.S. 2477, 43 U.S.C. § 932 (1866) (repealed 1976), threatens crucial conservation projects in the West. Although Congress intended the now-repealed statute to promote settlement of the American West, R.S. 2477 is increasingly perverted by local governments and recreationalists to open private roads for unrestricted use. This expanded access leads to unnecessary land fragmentation, which creates impediments to conservation, such as reducing the size and quality of wildlife habitat, degrading ecosystems, and reducing biodiversity. Even more, removing a landowner's right to control access to *private* roads subjects the

3

surrounding land—and the conservation projects on these lands—to abuses by R.S. 2477 users. The abuses are compounded by the lack of enforcement resources in these remote locations and by local governments' lack of resources to maintain the rights-of-way.

**III.** The district court's decision relaxing the standard under R.S. 2477 runs counter to the statute's limited purpose and threatens existing and future conservation projects on private land. *First*, the district court's decision invites a flood of R.S. 2477 claims based on contested and piecemeal historical accounts of road use. These claims will subject landowners to debilitating litigation. And, if recognized, the new public rights-of-way will magnify barriers to conservation from unnecessary land fragmentation and uncontrolled access to delicate ecosystems. *Second*, the district court's decision undermines the economic viability of conservation projects. More R.S. 2477 rights-of-way will derail crucial income drivers for landowners, which in turn will curb investment in private conservation. These rights-of-way will also introduce additional challenges, from gates left open, disturbance of livestock, trespassing, and vandalism, to mechanical breakdowns and animal-vehicle collisions, littering, road damage, and increased human-caused fire danger. *Third*, the district court's decision diminishes the certainty of property rights, rendering generational conservation projects economically impractical and operationally untenable.

# ARGUMENT

## I. The Conservation of Private Land in the West Is of Paramount Importance.

Any meaningful conservation of western lands must include private land. Because of how the West was settled, these lands have some of the richest biodiversity, per acre, found across the western landscape, and are typically where most of the fresh water is found. Amici's members recognize the import of their land to the ecological wellbeing of the environment and its wildlife by stewarding the land and investing in conservation with real and measurable benefits.

### A. The settlement of the American West.

At the time of Independence, the United States covered roughly 512 million acres.[2] By the start of the Civil War, that number swelled to nearly two billion acres, much of which was controlled by the federal government.[3] Flush with land, Congress routinely arranged for its disposition. Early on, the sale of public land was a means to generate revenue and to reduce the national debt; there was no national policy to directly encourage settlement.[4] But that changed in 1862 with the

---

[2] Greg Bradsher, *How the West Was Settled*, Prologue Mag., Winter 2012, at 27, 27, https://bit.ly/2RR3ARx.

[3] *See id.*

[4] *See* Lee Ann Potter & Wynell Schamel, *The Homestead Act of 1862*, Soc. Educ., Oct. 1997, at 359, 359.

5

adoption of a landmark law that helped guide how public lands were distributed and settled for over 100 years.

President Lincoln signed the Homestead Act into law on May 20, 1862. Pub. L. No. 37-64, 12 Stat. 392 (1862). Under the act, any U.S. citizen (or intended citizen) who had never borne arms against the United States could apply and lay claim to 160 acres of approved land. § 1. At the time, a billion acres of western land was made available by the government for homesteading.[5] Much of this land was unfit for settlement and agricultural development because it was situated in rugged mountain terrain and arid deserts. Nonetheless, "[i]n all, between 1862 and 1976, well over 270 million acres (10 percent of the area of the United States) were claimed and settled under the act."[6] Much of the homesteaded land remains in private hands today.

Unsurprisingly, early homesteaders sought out the most habitable, biologically diverse, and well-watered portions of the landscape to stake their future. Indeed, homesteaders often paid local "land locators" handsomely to secure the most favorable claims.[7]

But homesteaders were not the only ones to accumulate the West's most abundant lands. Even after the Homestead Act, other federal laws

---

[5] Bradsher, *supra* note 2.

[6] *Id.*

[7] *See* Paul Herndon, *They Called It Homesteading*, Our Pub. Lands, Summer 1977, at 12, 14–15.

6

divvied up prime territory across the West.[8] As Professor Paul Gates has observed, with over 465 million acres of railroad, state, Indian, and federal lands for sale, "it was still possible for foresighted [land] speculators to precede settlers into the frontier, purchase the best lands, and hold them for the anticipated increase in value which the succeeding wave of settlers would give to them."[9]

Today's working lands—many ranches and farms that remain in private ownership—are rich in biodiversity and contain most of the West's fresh water.[10] People chose to settle these lands for the same reason so many wildlife and plant species depend on them for survival—they are fertile, productive, and habitable. In contrast, and despite their rugged beauty, many of today's wilderness areas were available for wilderness protection precisely because they were passed over by early settlers. They were (and are) the least habitable, most environmentally extreme portions of the western landscape.

That is not say wilderness areas are immaterial. These lands are critical to conservation in the western United States, an area that is one

---

[8] Paul W. Gates, *The Homestead Law in an Incongruous Land System*, 41 Am. Hist. Rev. 652, 656 (1936).

[9] *Id.* at 662.

[10] *See* Lesli Allison et al., *Speaking from Experience: Landowners & the Endangered Species Act*, W. Landowners All., 2017, at 50, https://bit.ly/33T9JzL.

of the last ecologically intact, large landscapes on Earth.[11] That said, private land is often the most ecologically valuable in an area "considered by many to be among the highest conservation priorities."[12] The figure below shows the high degree of ecological integrity (or low degree of human modification) and connectivity in the West.[13]



Because of the quality of private land in the West, and the outsized role these lands play in maintaining key wildlife and other natural values, careful management and conservation of the land is of paramount regional and national importance.

---

[11] Cole Mannix & Lesli Allison, *Conservation Economics on Western Working Lands*, W. Landowners All., Dec. 2019, at 20, https://bit.ly/33B3XCu.

[12] R. Travis Belote et al., *Wild, Connected, and Diverse: Building a More Resilient System of Protected Area*, Ecological Applications, June 2017, at 1050, 1051, https://bit.ly/3bmUt2d.

[13] *Id.*

### B.    The conservation of working land requires private participation and action.

Conservation on private land in the West depends heavily on the participation and actions of landowners and the influences shaping their actions. Amici's members have implemented projects and practices on their lands to promote conservation, including wildlife conservation and conservation directed at environmental challenges.

***Working lands and wildlife conservation.*** The ranches and farms of amici's members support projects aimed at conserving wildlife species, and include:

- In what is considered to be the largest collaborative conservation effort in history more than 1,100 ranchers have restored or conserved approximately 4.4 million acres of key habitat for the imperiled Greater Sage Grouse. The federal government expects voluntary, private-land conservation efforts for the species to reach 8 million acres.

- Stream restoration projects on western ranches have restored several species of trout once thought extinct. One Nevada ranch worked with federal and state agencies and Trout Unlimited to resurrect the Lahontan Cutthroat Trout. And a Colorado ranch is actively conserving streams for the benefit of the San Juan strain of the Colorado Cutthroat Trout, a species presumed extinct for 100 years until rediscovered in 2018.

- Conservation efforts on a working ranch in Nevada helped to expand and manage storing springs, wetlands, and riparian areas to support a species of toad (the Amargosa toad) that is found nowhere else on Earth. (*See* video describing this project: https://bit.ly/3hpGNac.)

- A cattle company in New Mexico implemented grasslands conservation projects on its ranch. Despite bird species declining at a rate of 50% over the last fifty years in grasslands

of special environmental significance, the conservation practices on this ranch have increased bird species from seventeen species in 2004 to over 100 species in 2018, including six shortgrass-prairie-bird species of conservation concern.

Private land is also vital to the landscape that makes up wildlife corridors—both land and water corridors. Migration routes, which have been shown to be learned by succeeding generations of wildlife, enable wildlife to exploit forage resources across time and space in response to factors such as plant phenology during spring green-up, snow accumulation at higher elevations in winter, and avoidance of predation and hunting. This includes the Northern Yellowstone Elk Herd. A subset of this herd—the Paradise Valley Herd—migrates out of the park during winter months to private ranches in a northern valley.[14] The elk that winter in the Paradise Valley travel 125 miles to reach the winter-range grasslands, where over 90% of the land is privately owned, as shown in the map below.

---

[14] *Wildlife Corridors Conservation Act of 2019: Hearing on H.R. 2795 Before H. Nat. Res. Subcomm. on Water, Oceans, and Wildlife of the H. Comm. on Nat. Res.*, 116th Cong. 2–3 (2019) (statement of Catherine E. Semcer, PERC), https://bit.ly/2SIi6LT.



This movement is possible because landowners' land-management practices have kept these corridors intact.[15]

Wildlife corridors, and the habitat within them, are necessary to maintain healthy populations of numerous wildlife species but can be degraded or eliminated by land development. This includes road density and the inability to restrict public access and travel to minimize the disturbance during migration periods. Disruption of wildlife migration and movement on private land also has a direct impact on the ecosystems of surrounding public lands.

***Working land and the environment.*** In the West, healthy private grasslands and rangelands are already sequestering carbon, as

---

[15] *See* Whitney Tilt, *Elk in Paradise: Conserving Migratory Wildlife and Working Lands in Montana's Paradise Valley*, PERC, July 2020, https://bit.ly/3d8f0bs.

well as supporting biodiversity and agricultural livelihoods, but more is needed. The current Administration recognizes the need for intensive stewardship of our lands and waters. President Biden recently signed an executive order proposing to protect 30% of lands and 30% of oceans by 2030.[16] In response, the Departments of the Interior, Agriculture, and Commerce and the Council on Environmental Quality prepared a report identifying eight core principles for achieving this goal, including to "honor property rights and support voluntary stewardship efforts of private landowners and fishers."[17] This focus on property rights and voluntary stewardship is critical because the most promising conservation opportunities in the United States are on private land.[18]

Given the scope and scale of action required to combat today's environmental challenges, a short-term, piecemeal solution is insufficient. Rather, sustained, generational action based on land

---

[16] *See* Exec. Order No. 14,008, 86 Fed. Reg. 7,619, 7,627 (Feb. 1, 2021) (Section 216(a) on Conserving Our Nation's Lands and Waters).

[17] *See* U.S. Dep't of the Interior et al., *Conserving and Restoring America the Beautiful*, 2021, at 15 (capitalization omitted), https://on.doi.gov/3qktASI.

[18] *See, e.g.*, *Biden 30x30 Plan Emphasizes Landowners' Key Role in Conservation's Future*, W. Landowners All., May 6, 2021, https://bit.ly/3wVneM6; Brian Yablonski, *Private Land Stewardship Is the Next Frontier of Conservation and a Critical Component to Achieving 30 by 30*, PERC, May 6, 2021, https://bit.ly/35MlybK.

ethic[19] is the best path forward. As owners of ranches and farms in the West, amici's members appreciate this vision and responsibility. Member projects addressing environmental challenges include:

- Through the O'Dell Creek restoration project, a working ranch closed drainage canals and restored an extinct stream channel. The project resurrected wetland habitat, which makes up less than 2% of the landscape in the West, yet is used by 90% of species and is essential for biodiversity. The ranch documented a 600% increase in species diversity. (*See* video describing this project: https://bit.ly/33G0yCp.)

- A working ranching operation implemented high-density grazing to build soil and plant resiliency, increase forage, and increase carbon sequestration. (*See* video describing this pioneering practice: https://bit.ly/3uMrBrN.)

- A coalition of landowners in southern Arizona and New Mexico, who manage almost one million acres, coordinated resources to implement traditional land-management tools, such as prescribed burns and erosion control, in innovative ways. For example, these landowners are using fire to combat brush encroachment and to restore native grasslands and are using erosion control to conserve scarce water resources. (*See* video describing this project: https://bit.ly/2RNLlMY.)

*    *    *

Private or working land in the West harbor some of the most important habitat in the United States. But equally important is the ecological conscience landowners exhibit, which is reflected in a conviction of individual responsibility for the health of the land.

---

[19] *The Land Ethic*, Aldo Leopold Found. (last visited June 29, 2021), https://bit.ly/3i4hcnM.

## II.    Expanded Access Under R.S. 2477 Threatens the Success of Conservation Projects on Private Land.

Stewardship is a challenge for landowners and managers in the West due to the marginal productive capacity of most western lands, a high degree of annual variability, intermingling of public and private jurisdictions, and complex wildlife and recreational factors. At the same time, the open lands and space on which conservation is possible is disappearing at alarming rates. Between 2001 and 2017, western states lost more than 6.7 million acres to development.[20] That is equivalent to three Yellowstone National Parks. Of that, the expansion of the transportation sector, including road development, is responsible for a natural-area loss of nearly 600,000 thousand acres.[21]

Conservation-minded action on the remaining private land in the West, with its disproportionate water resources and wildlife habitat, is of fundamental importance to the larger landscape. Landowners, however, face threats and barriers to implementing sound management and conservation. These threats include the unnecessary and forced fragmentation of private land and the lack of enforcement resources when access to private land is expanded.

---

[20] *Why Protecting 30% of Lands and Waters is Critical*, Wilderness Soc'y, Mar. 5, 2021, https://bit.ly/33JbPlG.

[21] *See The Disappearing West*, Ctr. Am. Progress (last visited June 29, 2021), https://bit.ly/2ROx4j8.

The mechanism often used to force open these wild spaces (both on private and public land) is an arcane, repealed federal statute referred to as R.S. 2477. *See* 43 U.S.C. § 932 (1866) (repealed 1976). This relic reads: "The right-of-way for the construction of highways over public lands, not reserved for public uses, is hereby granted." R.S. 2477 was adopted "during a period in our history when the federal government was aggressively promoting settlement of the West."[22] Indeed, R.S. 2477 was the "primary authority under which many existing state and county highways were constructed and operated over federal lands in the [w]estern United States."[23]

For much of its history, R.S. 2477 was a benign grant.[24] But, ironically since its repeal, R.S. 2477 has become a powerful sword in the battle over control of western lands and their resources.[25] "Throughout the [W]est, states, counties, and even individuals and groups pushing for unrestricted motorized access to remote public lands are using R.S. 2477 to try to frustrate environmentally protective measures imposed

---

[22] U.S. Dep't of the Interior, Report to Congress on R.S. 2477: The History and Management of R.S. 2477 Rights-of-Way Claims on Federal and Other Lands 1 (June 1993).

[23] *Id.*

[24] Bret C. Birdsong, *Road Rage and R.S. 2477: Judicial and Administrative Responsibility for Resolving Road Claims on Public Land*, 56 Hastings L.J. 523, 524 (2005).

[25] *Id.*; Michael S. Freeman & Lusanna J. Ro, *RS 2477: The Battle over Rights-of-Way on Federal Land*, Colo. Law., Oct. 2003, at 105, 105.

by federal land managers."[26] To be sure, the leading protagonists for fighting R.S. 2477 overreach have been environmental and conservation groups. *See, e.g.*, *The Wilderness Soc'y v. Kane Cnty.*, 632 F.3d 1162 (10th Cir. 2011) (en banc); *S. Utah Wilderness All. v. BLM*, 425 F.3d 735 (10th Cir. 2005); *Sierra Club v. Hodel*, 848 F.2d 1068 (10th Cir. 1988).

But the problems associated with R.S. 2477 overreach are not unique to *public* land. In fact, the ecological threats from forced fragmentation of private land through R.S. 2477 are more acute on private land because of the essential habitats these lands hold and the distinct lack of enforcement resources to regulate expanded access to private land under R.S. 2477.

### *Problems with habitat fragmentation and conservation.*

Simply, the more private land is fragmented, the more difficult it is to effectively implement conservation practices on the land. Habitat fragmentation includes the breaking up of continuous tracts of habitat into smaller, spatially distinct tracts of land, and is one of the "primary cause[s] for biodiversity loss and ecosystem degradation worldwide."[27] Fragmentation reduces continuous habitat, creating barriers to wildlife's movement; increases "edge effect" (i.e., the perimeter between

---

[26] Birdsong, *supra* note 24.

[27] Maxwell C. Wilson et al., *Habitat Fragmentation and Biodiversity Conservation: Key Finds and Future Challenges*, Landscape Ecology, Feb. 2016, at 219, 219, https://bit.ly/3yaNC5w.

intact land and manipulated land), changing the biotic and abiotic of interior habitat and reducing habitat quality; and exacerbates "isolation effect," limiting available resources (i.e., food, water, cover, and other needs for survival and reproduction) and causing inbreeding and higher mortality rates for species that have difficulty traveling between fragmented tracts of land.[28]

Unrestricted road use across private land can lead to land fragmentation. Of course, some use of roads across private land is a given on western working lands. Private roads allow farmers and ranchers to reach and service different parcels of their property, allow for emergency and essential services access (e.g., firefighters), and serve as important means of transportation for people, equipment, and wildlife. But private road use can be abused when access to the road is not properly controlled. Unrestricted road use necessarily fails to account for nearby or intersecting conservation projects, migration corridors, and problems associated with road degradation from overuse.

A natural consequence of opening R.S. 2477 access points is to increase traffic, road pollution, and road noise, and to decrease landowners' ability to promote sustainable conservation. Thus, R.S. 2477 recognition removes a rancher's or farmer's ability to close access points on once-private roads during migration periods to lessen the

---

[28] *Fact Sheet: Habitat Loss & Fragmentation*, Wildlife Soc'y (last visited June 29, 2021), https://bit.ly/3yhSTbD.

pressures imposed on migrating ungulates (e.g., elk and deer).
Likewise, it may disturb ongoing conservation projects along the
recognized right-of-way—such as stream channels that often run
alongside roads—by subjecting the road and the surrounding areas to
increased pollution, road debris, and abuses by road users.

**Problems with lack of enforcement resources for R.S. 2477
rights-of-way and conservation.** Perhaps the most significant threat
that R.S. 2477 poses to private conservation is from the lack of
resources to maintain and police public use of these "highways." The
two service roads at issue in this litigation prove the point.

Before the district court, the County admitted it will not limit
access to these service tracks, but rather they would be open to all
traffic and all forms of transportation. (App. Vol. 4 at 796:9–12.) Even
more, the County disclaimed responsibility to maintain the roads. (*Id.*
at 795:5–7, 820:10–13 (admitting "[w]e have hundreds, if not thousands
of miles of road without the means to go ahead and maintain them
all").) This land grab—and refusal to accept maintenance
responsibility—threatens mitigation and restoration work on the
property in response to the Pine Gulch Fire, one of the largest fires in
Colorado history, and the landowner's ability to protect and use the
roads and surrounding land. (*See* App. Vol. 3 at 549:10–552:1.)

These constraints are not unique to the County. Many local
governments in the West face tight budgets. Yet, most ranch roads are

18

dirt or gravel, and public use, particularly in wet weather, degrade road systems requiring maintenance. In some cases, such degradation makes roads difficult or impossible to use by landowners and service providers, including emergency and utility-service vehicles. One of amici's members spends tens of thousands of dollars on drainage and road maintenance and prohibits *all* road access during wet periods. Even more, ruts and degraded roads contribute to sedimentation in streams and riparian areas, undermining conservation investments in water quality and habitat. Sedimentation also creates challenges for agricultural irrigation. Thus, even a measured application of R.S. 2477 harms private land due to the lack maintenance resources.

Eliminating landowners' ability to control access also exposes them and their lands to egregious and abusive conduct from promoters and users of R.S. 2477 rights-of-way. Examples include:

- Boulder County, Colorado: a group of off-road organizations, including the Mile-Hi Jeep Club, Trailridge Runners 4WD Club, and Off-Road.com, bullied a landowner and promoted an R.S. 2477 right-of-way to create off-road, motorized recreation areas on private land. The abusers also drove through sensitive riparian habitat, tore down signs, spray painted rocks, and removed seedling trees that the landowner planted with the local soil conservation district.[29]

---

[29] *See* Mark Boslough, *RS 2477 Reform Is Needed to Protect Private Property*, Entering Stage Right, Feb. 23, 2004, https://bit.ly/2RpHQfU (editorial by aggrieved landowner); *RS 2477 Fact Sheet: Impacts on Private Property*, S. Utah Wilderness All. (last visited June 29, 2021), https://bit.ly/3webQdy.

- Kane County, Utah: angry hunters and off-road users cut fences, tore down signs, and left gates open under the authority of R.S. 2477, when they believed the landowner was trying to limit access. The landowners were forced to file a lawsuit to stop these abuses.[30]

- Dolores County, Colorado: a landowner, under the guise of R.S. 2477, bulldozed a path across a neighboring landowner's property without permission or a legal right to do so.[31]

- Mesa County, Colorado: one of amici's members was physically assaulted at gunpoint by a trespasser who claimed, incorrectly, he had a right to access a road through a private ranch.

- Other members reported working cattle dogs shot, wildlife poaching, arson, illegal shooting, off-road vehicle damage, cut fences, livestock rustling, livestock harassment, human waste, and increasingly hostile confrontations with the public who believe they are entitled to access and hunt on private land.

These abuses emphasize a significant problem with expanded access under R.S. 2477: the lack of enforcement by competent authorities. R.S. 2477 rights-of-way are often in remote areas that are difficult to access, and federal and state officials charged with policing these vast landscapes lack the resources to patrol and timely respond to

---

[30] *See* Jana & Ron Smith, *Beware the Consequences of RS 2477 Right-of-Way Claims*, Salt Lake Trib., June 21, 2003, https://bit.ly/3ft8ZX8 (editorial by aggrieved landowners).

[31] *See* Letter from Dr. S. Hoffman to Hons. Lew Entz & Jack Taylor, Colo. Sen. Comm. on Agric., Feb. 25, 2004, https://bit.ly/3tP1sao (letter by aggrieved landowner).

trespassers, poachers, and other criminal activity.[32] Nor do landowners have the authority to provide the enforcement needed.

Nor do the actions of R.S. 2477 users have to be egregious to imperil conservation efforts. For example, one of amici's members is a critical partner in restoring a native cutthroat trout species. The member ranch ensures that visitors who wade or fish in its streams treat their boots, waders, and fishing gear prior to arrival to ensure they will not transmit or introduce whirling disease. These streams are in immediate proximity to roads and, without the ability to control access, the recovery effort and the control of invasive species, such as the parasite that causes whirling disease, would be lost.

*    *    *

In the end, the County admits the service roads at issue here will be *unrestricted* highways and that it lacks the resources to adequately maintain and police the roads. Ultimately, it will be the landowner, his land, and the wildlife that depends on his land that will bear the cost of the County's careless insistence on these rights-of-way.

---

[32] *See* 2015 Annual Parks & Wildlife Law Enforcement & Violation Report, Colo. Dep't Wildlife, 2015, at 7–8, https://bit.ly/3bCsagj.

III. **The District Court's Decision Will Exacerbate the Conservation-Related Problems Landowners Face and Will Curb Investment.**

The district court's decision relaxes an already feeble standard for parties seeking to establish R.S. 2477 rights-of-way. Relaxing this standard is inconsistent with the statute's 19th century purpose, encourages a further manipulation of R.S. 2477, and jeopardizes necessary conservation efforts on private land.

As an initial matter, the district court's decision erodes the standard used in evaluating R.S. 2477 rights-of-way. That is, in concluding the County satisfied its burden to prove a right-of-way under R.S. 2477,[33] the district court relied heavily on one-sided, disputed, and intermittent historical accounts of the ranch roads. *See High Lonesome Ranch, LLC v. Bd. of Cnty. Comm'rs*, No. 17-cv-1260-RBJ-GPG, slip op. at 43–48 (D. Colo. Dec. 22, 2020). For instance, the district court's order considered century-old tax assessor documents, unrecorded deeds, and dated accounts of mining operations and individual families settling in western Colorado. *Id.* at 9–23. Sifting through this patchwork history, the district court concluded that landowner-travel between parcels in

---

[33] While "[t]he burden for creating an R.S. 2477 right-of-way is relatively low," *High Lonesome Ranch, LLC v. Bd. of Cnty. Comm'rs*, No. 17-cv-1260-RBJ-GPG, slip op. at 40 (D. Colo. Dec. 22, 2020), the party seeking to enforce rights-of-way carry the burden of proof, *S. Utah Wilderness All. v. BLM*, 425 F.3d 735, 768 (10th Cir. 2005).

1905 and mining activity from 1917 rendered these service tracks "public highways." *See id.* at 45–46.

This view is problematic for several reasons. At the outset, this new relaxed standard—relying on intermittent and questionable road use from 100 years ago—is inconsistent with R.S. 2477's limited original purpose: to allow for public construction of highways to accelerate post-Civil War settlement of the West. But the West is now long-settled and has established a network of highways and roads connecting the country. To be sure, Congress recognized the same, abandoning its "pro-homesteading" approach when it repealed R.S. 2477, adopting "a preference for retention of the lands in federal ownership, with an increased emphasis on *conservation and preservation.*" *S. Utah Wilderness All. v. BLM*, 425 F.3d 735, 740–41 (10th Cir. 2005) (emphasis added) (citing Federal Land Policy and Management Act of 1976, Pub. L. No. 94-579, 90 Stat. 2743 (1976) (codified at 43 U.S.C. §§ 1701 to 1787)). Thus, contrary to its limited purpose, the district court's decision encourages antagonists to manipulate R.S. 2477 to gain access to long-established private roads.

In that way, the district court's error thwarts conservation on the land of amici's members. *First*, the district court's decision threatens to reanimate and unleash stale R.S. 2477 claims on sensitive ecosystems across the western United States. The relaxed standard sanctioned by the district court invites razor-thin R.S. 2477 claims supported by

23

incomplete and out-of-context histories of the use of private roads, two-track paths, cow trails, and creek beds across private land. A flood of R.S. 2477 rights-of-way will magnify barriers to conservation from unnecessary land fragmentation and uncontrolled access to protected and delicate ecosystems.

In the least, the district court's decision guarantees to subject landowners to debilitating litigation, putting severe downward pressure on businesses that are already struggling to survive. In addition to their importance to conservation, private land provides critical food security and sustains rural livelihoods and local and state economies. When COVID-19 hit, communities around the country faced empty grocery-market shelves and quickly turned to their local farmers and ranchers for food. In the West, agriculture is a primary economic driver in many rural locales, and yet family farms and ranches are disappearing. Thin profit margins, unpredictable weather, climate change, and volatile markets make agriculture a notoriously difficult business. Opening public access through ranches and farms will only add to wide range of challenges landowners already face.

*Second*, the district court's decision threatens the economic viability of, and landowner's willingness to invest in, conservation projects on their land. To understand the impact of the district court's decision on the economic viability and future success of conservation on private land, it is helpful to understand the unique economics behind

24

western working lands. Unlike public-land management, which is based on agency budgets and federal resources, private stewardship must support itself.[34] That is, landowners and land managers must delicately balance ecological needs with market forces to effectively—and profitably—manage their land.

Historically, the primary (if not only) source of income for ranches and farms was through commodity production. But, in order to remain economically viable while also stewarding land for ecological values and accommodating wildlife needs, landowners have diversified their income to include not just commodity production, but also alternative enterprises related to ecotourism and agritourism, including hunting and fishing, film productions, and special-event venues.[35]

To be sure, the hunting and fishing industry alone generates more than $200 billion in economic activity in the United States.[36] One member ranch in eastern Wyoming, for example, relies on its hunting operation as a significant revenue stream to support its broader operations.[37] Although the ranch's cattle business remains its core revenue source, its hunting operation generates approximately 20% of

---

[34] *Paying for Stewardship: A Western Landowners' Guide to Conservation Finance*, W. Landowners All., Mar. 2020, at 6–7, https://bit.ly/3yanTKu.

[35] *Id.* at 83.

[36] *Id.* at 79.

[37] *Id.* at 83.

its yearly gross income.[38] Additionally, landowners provide habitat to wildlife at a significant cost, and hunting and fishing operations enable landowners to recoup some of that cost and incorporate wildlife stewardship into their business models.

Economic activity generated on and from working land is not limited to hunting and fishing. Ecotourism—i.e., tourism directed toward natural environments intended to support conservation and observe wildlife[39]—is a multi-billion dollar industry in the United States and includes everything from birding and other wildlife viewing trips, to film production and weddings in remote locations.[40] Likewise, agritourism is nearly a billion dollar industry, and includes recreational or educational activities like working-farm tours and pick-your-own fruit and vegetable programs.[41] These activities help educate the public

---

[38] *Id.*

[39] James MacGregor, *Developing a National Sustainable Tourism Strategy: Going Beyond Ecotourism to Protect the Planet's Resources*, *in* 99 Bull. Series, Yale Sch. of Forestry & Env't, The Ecotourism Equation: Measuring the Impacts 11–12 (Elizabeth Malek-Zadeh ed., 1996), https://bit.ly/3hsOm05.

[40] *See* Marsha Sitnik, *Sustainable Ecotourism: The Galapagos Balance, in* 99 Bull. Series, Yale Sch. of Forestry & Env't, The Ecotourism Equation: Measuring the Impacts 89 (Elizabeth Malek-Zadeh ed., 1996), https://bit.ly/3hsOm05.

[41] Christine Whitt et al., *Agritourism Allows Farms To Diversify and Has Potential Benefits for Rural Communities*, U.S. Dep't Agric., Econ. Rsch. Serv., Nov. 4, 2019, https://bit.ly/3f12z2z.

about agriculture and preserve agricultural heritage, while revitalizing rural economies.[42]

Western landowners, including amici's members, participate in these enterprises to generate income to sustain private stewardship.[43] This helps stabilize bottom lines and brings money into local communities, supporting jobs and diversified economies. These enterprises, however, are premised on *limited or exclusive access* to preserve the remote and untouched settings that drive consumer demand to visit and view these landscapes.[44]

A member ranch in Montana's Madison Valley exemplifies this economic incentive structure.[45] Like many western working lands, the ranch has a large cattle operation. It also invests in restoration projects, improving the land's grazing management, vegetation restoration, forage productivity, and diversity. One restoration project on the ranch, the O'Dell Creek restoration project, is the largest private wetland

---

[42] *Id.*

[43] Mannix & Allison, *supra* note 11, at 18.

[44] Robert Rattner, *Ecotourism's Identity Crisis: How Green is My Vacation?*, *in* 99 Bull. Series, Yale Sch. of Forestry & Env't, The Ecotourism Equation: Measuring the Impacts 83 (Elizabeth Malek-Zadeh ed., 1996), https://bit.ly/3hsOm05. "Ecotourism, if it is to be a positive force, therefore requires forethought and *restraint*. This may mean restraints on the numbers and types of visitors, limitations on services made available to visitors, limitations on visitors' activities, or even *restraint on access to some places*." *Id.* (emphasis added).

[45] *Paying for Stewardship*, *supra* note 34, at 27.

restoration effort in Montana.[46] Since completing its initial restoration work, the project increased the presence and density of waterfowl species, and the property now hosts fifteen species of concern.[47] The project also improved the water quality and habitats in riparian areas and "serves as an example of integrating wetland biodiversity conservation goals with local socio-cultural-economic concerns that are dependent on agriculture, sport fishing, and river-related tourism."[48]

The district court's opinion ignores the economic incentives that promote this sort of western conservation. The decision threatens to derail crucial income drivers, which in turn will curb investment in private conservation. At the same time, the court's view threatens to introduce a host of additional challenges, from gates left open, disturbance of livestock, trespassing, and vandalism, to mechanical breakdowns and animal-vehicle collisions, littering, road damage, and increased human-caused fire danger. And the responsibility to pay for the ills this misconduct causes will ultimately fall on landowners.

*Third*, the district court's decision diminishes the certainty of private-property rights—a foundational pillar of private conservation. For western landowners, investing time and resources into conservation

---

[46] *Id.*

[47] *Id.*; *see generally* Tara Lund, *Recovery of Rare Plant Population and Species Richness on a Calcareous Floodplain in Southwestern Montana*, Native Plants J., Spring 2021, at 81.

[48] Lund, *supra* note 47, at 88.

projects is impractical without legal certainty and protection of these investments. For example, opening public access through the middle of conservation projects will devalue the investments and disincentivize landowners from acquiring and conserving lands. This incentive structure is critical for future conservation.

The mindset that underlies this problem is generational. Indeed, without generational legal certainty of property rights, the benefits of holding large tracks of land in the West become less attractive to current landowners and prospective buyers. Simply put, purchasing large ranches and farms is unworkable if the landowner's rights can be trampled at any time by a—repealed—century-old statute.

## CONCLUSION

Amici asks the Court to REVERSE the district court. Western private land contains the most diverse and ecologically productive habitats in the United States. Meaningful conservation in the West requires robust conservation on these lands with the participation of and investment by landowners. The district court's decision not only threatens conservation at large, but it threatens conservation where it is needed the most—western private land.

Dated: June 29, 2021                    Respectfully submitted,

                                        *s/ Julian R. Ellis, Jr.*
                                        Christopher O. Murray
                                        Julian R. Ellis, Jr.
                                        Sean S. Cuff
                                        BROWNSTEIN HYATT
                                          FARBER SCHRECK, LLP
                                        410 17th Street, Suite 2200
                                        Denver, CO 80202
                                        (303) 223-1100
                                        cmurray@bhfs.com; jellis@bhfs.com;
                                        scuff@bhfs.com

                                        *Attorneys for Amici Curiae*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1.     This document complies with the type-volume limitation set forth in Federal Rules of Appellate Procedure 32(a)(7)(B) and 29(a)(5) because it contains **6,206** words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5)(A) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using 14-point font.

Dated: June 29, 2021.

*s/ Julian R. Ellis, Jr.*
Julian R. Ellis, Jr.

## CERTIFICATE OF SERVICE

I certify that on June 29, 2021, I electronically filed the Brief of Amici Curiae Private-Land Conservation and Agricultural Groups in Support of Appellant and Reversal with the Clerk of the Court for the U.S. Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system. All case participants are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

I further certify the seven printed copies of the amicus brief will be delivered to the Clerk of Court, U.S. Court of Appeals for the Tenth Circuit, Byron White U.S. Courthouse, 1823 Stout Street, Denver, Colorado 80257-1823, for delivery to the Court within five business days of the Court issuing notice the filing has been accepted.

Dated: June 29, 2021.

*s/ Julian R. Ellis, Jr.*
Julian R. Ellis, Jr.